UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| MARK R. BROWNING, | ) | CIV. 13-5038-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER |
| vs. | ) | |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

Plaintiff Mark R. Browning filed a complaint appealing from an administrative law judge's ("ALJ") decision denying disability benefits.   (Docket 1).   Defendant denies plaintiff is entitled to benefits.   (Docket 7).   The court issued an amended briefing schedule requiring the parties to file a joint statement of material facts ("JSMF").   (Docket 13).   The parties filed their JSMF.   (Docket 14).   For the reasons stated below, plaintiff's motion to reverse the decision of the Commissioner of the Social Security Administration ("SSA") (Docket 15) is granted in part and denied in part consistent with this order. Defendant's motion to affirm the decision of the Commissioner (Docket 18) is denied.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 14) is incorporated by reference.   Further recitation of salient facts is included in the discussion section of this order.

On June 2, 2010, plaintiff Mark R. Browning applied for social security disability benefits alleging a disability onset date of September 1, 2006. (Docket 14 at ¶ 1).   The claim was denied initially on September 3, 2010, and on reconsideration on December 17, 2010.   (Administrative Record at pp. 83-85, 87-88).[1]   Mr. Browning filed a request for a hearing on January 28, 2011, and a hearing was held on November 29, 2011.   (Docket 14 at ¶¶ 1, 2).   At the hearing, Mr. Browning amended his disability onset date to September 1, 2007. Id. at ¶ 2.   On December 13, 2011, the ALJ issued a decision finding Mr. Browning disabled only from September 1, 2007 to July 20, 2010, and found that a medical improvement occurred as of the latter date.   Id. at ¶ 3.   The ALJ subsequently amended his decision on February 28, 2012 and March 27, 2012, to reflect Mr. Browning's amended disability onset date, the medical improvement date and the date on which Mr. Browning's disability ended.   Id. at ¶ 3; see also AR at p. 23.

On January 13, 2012, Mr. Browning sought review of the ALJ's amended decision by the Appeals Council, challenging the finding that a medical improvement occurred on July 21, 2010.   (Docket 14 at ¶ 4).   On March 19, 2013, the Appeals Council denied the request for review.   Id. at ¶ 4.   The ALJ's decision constitutes the final decision of the Commissioner.   (Docket 14 at ¶ 4). It is from this decision that Mr. Browning timely appeals.   (Docket 1).

---

[1]The court cites to information in the administrative record as "AR at p. ___."

The issue before the court is whether the ALJ's decision of December 13, 2011, as amended on February 28, 2012 and March 27, 2012, finding Mr. Browning was "disabled under sections 216(i) and 223(d) of the Social Security Act, from September 1, 2007 through July 20, 2010" is supported by the substantial evidence on the record as a whole.   (AR at p. 38); see also Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole.   42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580.   The court reviews the Commissioner's decision to determine if an error of law was committed.   Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).   "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."   Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (citation and internal quotation marks omitted).

The review of a decision to deny disability benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account

whatever in the record fairly detracts from that decision." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' " Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

## DISCUSSION

"Disability" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment [or combination of impairments] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The SSA established a five-step sequential evaluation process for determining whether an individual is disabled. 20 CFR § 404.1520(a)(4). If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled. Id. The five-step sequential evaluation process is:

(1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe

4

impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard  to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998) (citing Kelley v. Callahan, 133 F.3d 583, 587-88 (8th Cir. 1987)).

The ALJ applied the five-step sequential evaluation required by the SSA's regulations.   (AR at pp. 34-35).   At the conclusion of the five-step process, the ALJ found "[t]he claimant was under a disability, as defined by the Social Security Act, from September 1, 2007 through July 20, 2010."   (AR at p. 35) (citations omitted).

The SSA established an eight-step sequential review process for determining whether a claimant's disability has ceased.   20 CFR § 404.1594(f). "The regulations for determining whether a claimant's disability has ceased may involve up to eight steps."   Dixon v. Barnhart, 324 F.3d 997, 1000 (8th Cir. 2003).   The eight steps are:

(1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there  has been a medical improvement, (4) if there has been medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is

5

> shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

Id. at 1000-01 (citing 20 CFR § 404.1594(f)); see also Wilson v. Astrue, No. 4:09cv1468 TCM, 2011 WL 903084, at *11 (E.D. Mo. Mar. 15, 2011).

"To discontinue a claimant's benefits because his or her medical condition has improved, the Commissioner must 'demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the physical condition is related to claimant's ability to work.' " Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001) (citing Nelson v. Sullivan, 946 F.2d 1314, 1315 (8th Cir.1991) (citing 20 CFR § 404.1594(b)(2)-(5)).   The Social Security regulations define a medical improvement as:

> [a]ny decrease in the medical severity of [a claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant] [was] disabled or continued to be disabled.   A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the claimant's] impairment(s).

Wilson, 2011 WL 903084, at *11 (quoting 20 CFR § 416.994(b)(1)(I)).

A "[m]edical improvement can be found in cases involving the improvement of a single impairment if that improvement increases the claimant's overall ability to perform work related functions."   Id. (citing 20 CFR § 416.994(c)(2)).   "Whether a claimant's condition has improved is primarily a

question for the trier of fact, generally determined by assessing witnesses' credibility." Muncy, 247 F.3d at 734 (citing Nelson, 946 F.2d at 1316).

In step three of determining whether Mr. Browning's disability continued through the date of his decision, the ALJ found there had been a medical improvement increasing Mr. Browning's residual functional capacity ("RFC"). (AR at p. 36).   In step eight of the evaluation, in light of the medical improvement, the ALJ found there were jobs that existed in significant numbers in the national economy that Mr. Browning could perform, and he was, therefore, no longer disabled.   Id. at 37.

## A.    PLAINTIFF'S ISSUES ON APPEAL

Mr. Browning identifies the following issues: (1) the ALJ erred by finding there was a medical improvement and failed to follow the treating physician rule; (2) the ALJ failed to properly evaluate Mr. Browning's credibility; and (3) the ALJ relied on flawed vocational expert testimony.   The court discusses each issue in turn.   (Docket 15-2)

### 1.    Whether the ALJ Properly Found a Medical Improvement

The ALJ found that Dr. Steven Frost's opinions "appear[ed] to be based on the claimant's subjective complaints, as [Mr. Browning's] treatment records . . . do not support such extreme limitations."   (AR at p. 37).   Mr. Browning argues the ALJ failed to properly evaluate Dr. Frost's credibility in reaching the conclusion that a medical improvement occurred because Dr. Frost's opinions, as Mr. Browning's treating physician, are entitled to controlling weight or, in the

7

alternative, "the greatest weight."   (Docket 15-2 at p. 4).   Defendant contends

the ALJ reasonably considered Dr. Frost's credibility in light of inconsistencies

between Dr. Frost's opinions and his treatment notes and the substantial

evidence in the record.   (Docket 19 at pp. 4-9).   The court finds the ALJ's

determination that Dr. Frost's opinions were not entitled to controlling weight is

supported by substantial evidence.   Prosch v. Apfel, 201 F.3d 1010, 1013-14

(8th Cir. 2000).   However, the court finds the ALJ erred by failing to consider all

of the factors enumerated in 20 CFR §§ 404.1527(c) and 416.927(c) and thus, did

not conduct a proper analysis of the weight accorded to Dr. Frost's opinions.

### a.   Dr. Frost's Opinions Are Not Entitled to Controlling Weight

"A treating physician's opinion is given controlling weight if it is

well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence."   House

v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (citation and internal quotation

marks omitted).   However, "while entitled to special weight, it does not

automatically control, particularly if the treating physician evidence is itself

inconsistent."   Id. (citations and internal quotation marks omitted).   "It is well

established that an ALJ may grant less weight to a treating physician's opinion

when that opinion conflicts with other substantial medical evidence contained

within the record."   Prosch, 201 F.3d at 1013-14.   Therefore, the ALJ must

"give good reasons for discounting a treating physician's opinion."   Dolph v.

Barnhart, 308 F.3d 876, 878-79 (8th Cir. 2002).

In this case, Dr. Frost was Mr. Browning's treating physician.   (AR at pp. 37, 985-1003).   Mr. Browning was transferred to Dr. Frost's care on May 27, 2010, due to Mr. Browning moving to South Dakota.   Id. at 737.   Dr. Frost is a pain management specialist.   (Docket 14 at ¶ 34).   Dr. Frost or a member of Rapid City Regional Pain Management examined Mr. Browning on at least four separate occasions during the four-month period immediately preceding Dr. Frost's completion of the Multiple Impairment Questionnaire ("Questionnaire") relied upon by the ALJ in assessing Dr. Frost's findings.   (AR at pp. 977-84, 986-1002).

Dr. Frost's treatment notes indicate he based his assessment of Mr. Browning's physical capacity, in part, on Mr. Browning's explanation of the location and intensity of his pain.   See Id. 985-1003.   However, Dr. Frost also based his opinions on the positive clinical findings of pain on palpation, pain at ten degrees of flexion of the lumbar spine and pain at five degrees of extension of the lumbar spine.   (Docket 14 at ¶ 46); see also AR at p. 977.   Dr. Frost indicated his opinions were based on Magnetic Resonance Imaging ("MRI") showing degenerative joint disease at L2-L3 and L4-L5 and at the fusion between L3 and L4.   (Docket 14 at ¶ 46); see also AR at p. 978.

In the Questionnaire, Dr. Frost opined Mr. Browning's pain was normally at a level 6/10 when not fatigued and a level 7/10 when fatigued.   (AR at p. 979).   Dr. Frost opined Mr. Browning only could sit for 0-1 hour and stand/walk for 0-1 hour in an eight-hour day.   Id.   Dr. Frost noted that Mr.

9

Browning needs to get up and move around every thirty minutes and must wait thirty minutes after getting up before sitting down again.   Id. at 979-80.   Dr. Frost opined Mr. Browning could lift and carry 0-5 pounds frequently, 5-10 pounds occasionally and never lift or carry anything in excess of 10 pounds.   Id. at 980.   Mr. Browning's ability to grasp, turn or twist objects was moderately impaired.   Id.   Mr. Browning's ability to use his fingers and hands for fine manipulation was minimally impaired.   Id. at 981.   Dr. Frost opined Mr. Browning's ability to use his arms for reaching, including overhead, was moderately impaired.   Id.

Dr. Frost opined Mr. Browning's symptoms would increase if he was placed in a competitive work environment, and Mr. Browning would not be able to perform a full-time competitive job.   Id. 981-82.   Dr. Frost estimated Mr. Browning likely would be absent from work more than three times a month as a result of his impairments and treatment.   Mr. Browning would have "good days and bad days."   Id. at 983.   Finally, Dr. Frost opined Mr. Browning suffered symptoms of pain and/or fatigue frequently.   Id. at 982.

Central to the ALJ's decision to give little weight to Dr. Frost's opinions is the conflicting information contained in a functional capacity evaluation of Mr. Browning performed by occupational therapist Kathleen Boyle, OT/L.   See Id. at 773-814.   Ms. Boyle's four-hour evaluation of Mr. Browning included an interview, a muscoskeletal examination and a work capacity evaluation. (Docket 14 at ¶ 58).   Neither party disputes the methods employed or the

10

thoroughness of Ms. Boyle's evaluation.   Ms. Boyle found "Mr. Browning put forth maximum voluntary effort during testing and verified the validity of the results with computer analysis."   Id. at ¶ 60.   In her evaluation, Ms. Boyle opined:

> [Mr. Browning] tolerates sitting frequently for 60 minute intervals (4 hours per day). Dynamic standing is tolerated frequently for 45 minute intervals (3 hours per day), and static standing is poorly tolerated for 15 minute intervals (1 hour/day). Frequent weight shifting, compensatory posturing to take pressure off of his low back by leaning forward, and alternating between sitting and standing is noted throughout this evaluation.

(AR at p. 782).

Ms. Boyle further opined:   Mr. Browning could frequently squat, reach at or above shoulder level, kneel, climb stairs, and lift; Mr. Browning could infrequently stoop/bend and crawl; Mr. Browning could rarely balance and climb a ladder; and Mr. Browning could never crouch.   Id. at 776-77. Ms. Boyle determined Mr. Browning could, depending on the type of exercise, lift eight to eighteen pounds occasionally, five to sixteen pounds frequently, and could lift and carry eighteen pounds for up to fifty feet.   Id. at 777.   Finally, Ms. Boyle reported Mr. Browning could repetitively operate foot and hand controls and repetitively engage in fine manipulation with his hands.[2]   Id. at 778.

During the evaluation, Mr. Browning "reported that his pain was 7/10 in his lumbar spine and down his right leg."   (Docket 14 at ¶ 59).   Ms. Boyle stated

---

[2]The ALJ adopted Ms. Boyle's findings in reaching his determination of Mr. Browning's RFC.   See AR at p. 36.

that "she did not observe pain at this level throughout Mr. Browning's evaluation," as pain at that level "is described as severely disabling and would not allow a person to move or use the painful area, requiring a person to lie down; a person would have difficulty concentrating on anything but pain at this level, and pain-related tearfulness is common at this level of pain."   Id. (internal quotation marks omitted).

Dr. Frost's and Ms. Boyle's opinions regarding the extent of Mr. Browning's disability are markedly different.   For example, Ms. Boyle believes Mr. Browning can continuously work eight-hour days consisting of sitting for four hours per day in sixty minute intervals and dynamically and statically stand for four hours per day in forty-five and fifteen minute intervals, respectively.   Conversely, Dr. Frost believes Mr. Browning can only sit for 0-1 hour and stand/walk for 0-1 hour in an eight-hour work day.   Both opinions are well reasoned and, as is discussed more thoroughly below, both find support in portions of Dr. Frost's treatment notes.   Therefore, the court finds the ALJ properly considered both Ms. Boyle's and Dr. Frost's inconsistent opinions.   See Prosch, 201 F.3d at 1013-14.   The ALJ's decision not to give Dr. Frost's opinions controlling authority is supported by substantial evidence.

### b.      The ALJ Improperly Disregarded Dr. Frost's Opinions

As a general rule, "[a] treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight."   Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991);

see also Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003) ("Generally, more weight is given to opinions of sources who have treated a claimant, and to those who are treating sources."). Id. at 426. The SSA regulations provide " '[w]hen the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.' " Shontos, 328 F.3d at 426 (quoting 20 CFR § 404.1527(d)(2)(i)). "By contrast, '[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.' " Singh, 222 F.3d at 452 (citing Kelley, 133 F.3d at 589).

An ALJ may nonetheless "grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record." Prosch, 201 F.3d at 1013-14 (citing Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999); Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)). "[A]n ALJ may credit other medical evaluations over that of the treating physician when such other assessments 'are supported by better or more thorough medical evidence.' " Prosch, 201 F.3d at 1014 (quoting Rogers, 118 F.3d at 602) (citing Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); Ward v. Heckler, 786 F.2d 844, 846-47 (8th Cir. 1986)).

As indicated above, Dr. Frost's opinions regarding the extent Mr. Browning's disability prohibits him from working is in conflict with Ms. Boyle's assessment. The court now examines Mr. Browning's treatment notes and

other evidence contained in the record as a whole in its review of the ALJ's determination to give little weight to Dr. Frost's opinions.

### i.   Dr. Frost's Opinions Were Not Based Entirely on Mr. Browning's Subjective Complaints

Dr. Frost's treatment records are not based entirely on Mr. Browning's subjective complaints.   To be sure, the treatment records maintained by Dr. Frost and the other pain management doctors at Rapid City Regional Pain Management indicate that the examining doctors relied, in part, on Mr. Browning's subjective complaints of pain in his lower back.   But Mr. Browning's medical history and the posture of his current course of treatment and prior surgeries cannot be ignored.   A brief recitation of Mr. Browning's medical history is helpful.

On September 7, 2007, a lumbar Computerized Tomography ("CT") myelogram "revealed a mild broad-based disc protrusion at L3-L4 and L4-L5 with mild central spinal stenosis at L4-L5, mild facet joint hypertrophy from L3 through S1, and incidental limbus vertebrae at L4.   (Docket 14 at ¶ 7).   On January 7, 2008, after an epidural injection failed to relieve his pain, Mr. Browning underwent a posterior lumbar interbody fusion at L3-L4.   Id. ¶ 11-12. "The surgery involved implantation of rods and screws into his back and an iliac crest bone graft."   Id. at ¶ 12.   Following surgery, Dr. Simpson, Mr. Browning's treating physician at the time, diagnosed Mr. Browning's condition as "degenerative disc disease and internal disc disruption at L3-L4, back pain, lower extremity pain, and lumbar radiculopathy."   Id.   By June 24, 2008, Mr.

14

Browning's condition had deteriorated enough that a second lumbar myelogram was performed.   It "showed post-surgical changes at L3-L4 since September 7, 2007, including partial laminectomy, a left thecal sac defect at L3-L4 'suggesting new herniation more pronounced than' in September 2007, a broad-based disc protrusion at L4-L5, and facet hypertrophy from L3 through S1."   Id. at ¶ 16 (quoting AR at p. 529).

On October 3, 2008, following a CT scan of his L3-L4 vertebrae and a lumbar spine MRI indicating failed laminectomy syndrome (a painful buildup of scar tissue following a laminectomy), Mr. Browning underwent a right L3-L4 hardware injection to relieve pain caused by the rods and screws in his back, stenosis and degenerative changes at L4-L5.   (Docket 14 at ¶¶ 21-22).   On January 26, 2009, Mr. Browning underwent an anterior-approach revision fusion spinal surgery whereby "[t]he surgical hardware from his first surgery was removed and replaced, and the L3-L4 vertebrae were fused with a synthetic spacer."   Id. at ¶ 26.   On October 16, 2009, after Mr. Browning reported his pain was worsening, "[a] lumbar spine CT scan . . . revealed a mild broad-based disc bulge at L2-L3 with associated mild ligamentum flavum hypertrophy and lateral recess narrowing, and a mild broad-based disc bulge at L4-L5."   Id. at ¶ 31.

On May 27, 2010, Dr. Simpson concurred with Dr. Rand Schleusener that Mr. Browning had a "solidly fused spine at L3-L4 but with degenerative changes both above and below that level."   Both physicians recommended no further

15

surgical intervention and a focus on pain management.   Id. at ¶ 35 (citing AR at

p. 737).   Also on May 27, 2010, Mr. Browning's care was transferred to Dr.

Frost.   (AR at p. 737).   On June 2, 2010, Mr. Browning completed a functional

progress questionnaire indicating he had pain in his lower back and right leg.

Id. at 892.   Mr. Browning further indicated his pain ranged from a level 5/10 to

a level 8/10, and it moderately disturbed his sleep.   Id.   Dr. Nesbit, the

examining physician, diagnosed Mr. Browning with post-laminectomy syndrome

and chronic low back pain.   (Docket 14 at ¶ 36).   Dr. Nesbit noted Mr.

Browning "exhibited paravertebral tenderness in the lumbar spine, negative

straight leg raising bilaterally, increased pain with lateral bending, no pain with

flexion or extension, no motor or sensory deficits, and an antalgic gait with full

(5/5) strength in both legs, and no motor or sensory deficits."   Id.

On June 25 and July 29, 2010, Dr. Nesbit performed nerve block

injections at Mr. Browning's L2, L3 and L4 vertebrae.   Id. at ¶ 37.   Mr.

Browning reported the nerve blocks provided relief for only two weeks.   Id. at

¶ 38.   On October 21, 2010, Dr. Frost performed a nerve branch facet rhizotomy

at Mr. Browning's L2, L3 and L4 vertebrae, which at the time Mr. Browning

reported resulted in a fifty percent reduction in his pain.   Id. at ¶ 39.   On

September 20, 2011, Mr. Browning began a new course of physical therapy.

The therapist assessed his rehabilitation potential as "[g[ood for lumbopelvic

stabilization, poor for significant pain improvement."   Id. at ¶ 43.   On

November 17, 2011, Dr. Frost diagnosed Mr. Browning with post-laminectomy

lumbar syndrome at L3-L4 and lumbar facet syndrome.   Id. at ¶ 46.   Dr. Frost's assessment was based on his "clinical findings of pain on palpation, pain at 10 degrees of flexion and at 5 degrees of extension of the lumbar spine, and MRIs showing degenerative joint disease at L2-L3 and L4-L5, with L3-L4 fused."   Id.

The court's recitation of Mr. Browning's past diagnoses, surgeries and examinations demonstrates Mr. Browning's back condition was the subject of extensive diagnostic testing and clinical evaluations.   Much of this information was known and available to Dr. Frost when Mr. Browning was transferred to his care.   Moreover, in his November 17, 2011 treatment notes, Dr. Frost indicated he had considered Mr. Browning's MRIs and X-rays, past medical records, pain diary, past surgeries, list of medical conditions, medication list and medication summary.   (AR at pp. 986-87).

Mr. Browning's medical history contains many findings and diagnoses by his treatment providers regarding the source, extent and duration of Mr. Browning's pain, all of which Dr. Frost considered in reaching his assessment of Mr. Browning's physical capacity.   Mr. Browning's treatment notes while under the care of Dr. Frost cannot be evaluated without reference to the findings contained in Mr. Browning's extensive medical history.

Dr. Frost also performed his own clinical examination of Mr. Browning. (Docket 14 at ¶ 46).   Dr. Frost's diagnosis of the cause of Mr. Browning's pain was consistent with that of Dr. Simpson, Dr. Schleusener and Dr. Nesbit. (Docket 14 at ¶¶ 35-36).   It is clear that Dr. Frost relied on his own clinical

17

findings and testing and considered Mr. Browning's medical history in reaching his opinions.   Id. at ¶ 46; see also AR at pp. 986-87.   Dr. Frost's opinions were not based entirely on Mr. Browning's subjective complaints, are supported by objective findings and are consistent with Mr. Browning's prior medical history. See 20 CFR § 404.1527(c)(3) and (c)(4).   Accordingly, the ALJ should have given more weight to the opinions of Dr. Frost.   See Singh, 222 F.3d at 452.

### ii.   The ALJ Failed To Consider All of the Section 404.1527(c) Factors

The United States Court of Appeals for the Eighth Circuit held if the treating physician's opinion is not given controlling weight under 20 CFR § 404.1527(c)(2), it must be weighed considering the factors in 20 CFR §§ 404.1527(c)(2)-(6).   See Shontos, 328 F.3d at 426 (citing 20 CFR § 404.1527(d)) ("The amount of weight given to a medical opinion is to be governed by a number of factors including the examining relationship, the treatment relationship, consistency, specialization, and other factors."). "Unless we [the SSA] give a treating source's opinion controlling weight . . . we consider *all* of the following factors in deciding the weight we give to any medical opinion."   20 CFR § 404.1527(c) (emphasis added); see also 20 CFR § 416.927(c) (applying the same language referenced in 20 CFR 404.1527(c)).   The factors an ALJ must consider in determining the weight to assign a treating physician's opinions are: the physician's examining relationship with the claimant; the physician's treatment relationship with the claimant, including the length of the relationship and the nature and extent of the relationship; the supportability of

the opinion; the consistency of the opinion; the degree to which the physician is a specialist in the area; and other relevant factors.   See Shontos, 328 F.3d at 426; 20 CFR 404.1527(c) and 416.927(c); see also Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions, SSR 96-2P (S.S.A July 2, 1996).

Here the ALJ provided only a cursory statement discrediting Dr. Frost's opinions because they "appeare[ed] to be based on [Mr. Browning's] subjective complaint, as treatment records . . . do not support such extreme limitations." (AR at p. 37).   The government subsequently attempted to support the ALJ's finding by asserting Dr. Frost's opinions are unsupported by his treatment notes and are inconsistent with the record as a whole, referencing 20 CFR §§ 404.1527(c)(3) and 404.1527(c)(4), respectively.   (Docket 19 at pp. 6-9).

The ALJ cannot simply pick and choose which section 404.1527(c) factors apply in determining whether to credit the opinion of a treating physician.   The ALJ must consider *all* of the factors.   In this case, the ALJ gave no indication he considered several of the factors.   For example, Dr. Frost has been Mr. Browning's treating physician since May 27, 2010.   (AR at p. 737).   Dr. Frost is a board-eligible physician in the field of pain management.[3]   Dr. Frost treated Mr. Browning for a disabling musculoskeletal condition which included degenerative disc disease of the lumbar spine, post-laminectomy syndrome, bilateral lower extremity radiculitis, and chronic low back pain.   (Docket 14 at

---

[3]REGIONAL HEALTH, http://www.regionalhealth.com/Our-Doctors/Find-a-Doctor/F/Steven-G-Frost-MD.aspx (last visited Sept. 10, 2014).

¶ 51).   Dr. Frost's diagnosis of Mr. Browning's underlying condition—a condition the ALJ already found to constitute a disability—is consistent with Mr. Browning's prior medical history and the opinions of doctors Simpson, Schleusener and Nesbit.   (AR at p. 35).   The ALJ must consider Dr. Frost's opinions in light of all of the section 404.1527(c) factors.

### iii.   Dr. Frost's Treatment Notes and the Record as a Whole

With regard to the government's assertion that Dr. Frost's opinions are not supported by his treatment notes and are inconsistent with the record as a whole, (Docket 19 at p. 6-9) (citing 20 CFR §§ 404.1527(c)(3) and (c)(4)), this argument misses the mark for the reasons set forth in the preceding section. See supra.   The ALJ must consider all of the section 404.1527(c) factors. 20 CFR § 404.1527(c).   Mr. Browning's treatment records while at Rapid City Regional Pain Management highlight the pitfalls of considering only one factor in isolation.

The treatment records maintained by Dr. Frost and his colleagues at Rapid City Regional Pain Management must be viewed in light of Mr. Browning's typical response to treatment.   Mr. Browning's response to treatment is characterized by the alleviation of his pain at the outset followed by his body growing tolerant to the treatment and his pain returning.   See Docket 14 at ¶ 38 (the nerve block provided pain relief for only two weeks); Docket 14 at ¶ 40 (the nerve branch facet rhizotomy initially reduced Mr. Browning's pain by 50 percent, but by November 17, 2011, his pain returned to the 5/10 to 8/10 level (AR at p. 986)); (AR at p.

20

1070) (Mr. Browning became tolerant to the spinal cord stimulator and his chronic back pain continued); Docket 14 at ¶¶ 48, 49, 52 (documenting Mr. Browning's three epidural injections).   The court also notes Mr. Browning's pain has always been between a level 4/10 and a level 8/10, <u>see, e.g.</u>, AR. at pp. 986, 990, 995, 999, and Dr. Frost opined Mr. Browning has "good days" and "bad days."   <u>Id.</u> at p. 983.

The treatment notes documenting Mr. Browning's August 1, 2011, September 9, 2011, October 21, 2011, and November 17, 2011, visits to the Rapid City Regional Pain Management confirm both Mr. Browning's improvements and setbacks.   On August 1, 2011, Mr. Browning completed a functional progress questionnaire indicating "moderate impairments in walking, climbing stairs, and driving, [and] 'great difficulty' with sitting and sleeping and an inability to work."   (Docket 14 at ¶ 41).   Also on August 1, 2011, Dr. Frost noted swelling in Mr. Browning's lumbar spine.   (AR at p. 1000).

On September 9, 2011, Mr. Browning reported that he was "able to sweep, vacuum, and wash dishes. . . . his mood was better, as was his sleep, he could ride in a car for longer, and he could stay in bed all night."   (Docket 14 at ¶ 42). A functional progress questionnaire indicated Mr. Browning had no more than moderate impairments in climbing stairs, driving, sitting, sleeping, walking and working.   <u>Id.</u>

On October 21, 2011, Mr. Browning reported pain relief from a massage lasted only half an hour, he had trouble sleeping, and his pain was a "constant"

6/10 to 7/10.   Id. at ¶¶ 39, 44.   However, Mr. Browning also reported he was independent in his activities of daily living.   A functional progress questionnaire indicated his ability to climb stairs, drive, sit, walk and work were only moderately impaired.   Id. at ¶ 44.

On November 17, 2011, Mr. Browning reported he was independent in his daily activities, but his sleep was interrupted.   Id. at ¶ 45.   Mr. Browning's lower back was tender and the strength in his lower body was 4/5, while it was 5/5 in his upper body.   Id.   Mr. Browning favored his left side while he walked. Id.   A functional progress questionnaire again indicated Mr. Browning's ability to climb stairs, drive, sit, sleep, walk and work were only moderately impaired. Id.

In the November 17 questionnaire, Dr. Frost opined Mr. Browning's pain level is normally at a level of 6/10 and a level of 7/10 when fatigued, which is within the range documented in his treatment notes and is also in agreement with Mr. Browning's assertion his pain was at a level 7/10 during his evaluation with Ms. Boyle.   Compare AR at pp. 979, 986, 990, 995, 999, with AR at p. 775.

At times Mr. Browning demonstrated improvement in his functional capacity and was able to perform life's daily activities with only moderate impairment.   At other times, Mr. Browning's back was swelling, he was unable to sleep and he was in constant pain.   Dr. Frost's treatment notes support his opinion that Mr. Browning has good and bad days with respect to his ability to cope with pain.   This variation is the reason Mr. Browning's treatment notes,

22

while at Rapid City Regional Pain Management, are but one factor the ALJ must consider in determining the weight to give Dr. Frost's opinions.

As noted above, the ALJ cannot pick and choose which factors to apply. All of the factors must be considered and weighed against the others.   This is particularly true where portions of the same treatment notes lend support to the conflicting medical opinions of Dr. Frost and Ms. Boyle.   The ALJ failed to properly consider all of the factors in reaching his decision to discount Dr. Frost's opinions and entirely credit the opinions of Ms. Boyle.   The ALJ must reconsider the weight given to Dr. Frost's opinions in light of this analysis.

### 2.   Mr. Browning's Credibility

#### a.   Mr. Browning's Statements and Daily Activities

The ALJ determines the weight attributable to a claimant's subjective complaints, including pain, according to the framework created in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).   Five Polaski factors guide the ALJ's credibility determination:   "1) the claimant's daily activities; 2) the duration, frequency, and intensity of the pain; 3) the dosage, effectiveness, and side effects of medication; 4) precipitating and aggravating factors; and 5) functional restrictions."   Choate, 457 F.3d at 871.   The ALJ need not mechanically discuss each of the Polaski factors.   See Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).   Although the ALJ can discount a claimant's subjective complaints for inconsistencies within the record as a whole, "the ALJ must make express credibility findings and explain the record inconsistencies

that support those findings." <u>Dolph</u>, 308 F.3d at 879.   The court will not disturb the decision of an ALJ who seriously considers but for good reason expressly discredits a claimant's subjective complaints.   <u>See</u> <u>Haggard</u>, 175 F.3d at 594.

In assessing Mr. Browning's credibility, the ALJ found Mr. Browning's "medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, [Mr. Browning's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible beginning July 21, 2011, to the extent they are inconsistent with the residual functional capacity assessment."   (AR at p. 36).   The ALJ's determination that Mr. Browning's statements are not credible beginning July 21, 2011, is not supported by substantial evidence.   A review of those inconsistencies proves the point.

The ALJ noted that no further surgery was recommended for Mr. Browning.   <u>Id.</u>   However, Mr. Browning's underlying diagnosis had not changed.   Following his January 7, 2008, surgery, Dr. Simpson diagnosed Mr. Browning with degenerative disc disease.   (Docket 14 at ¶ 12).   A September 18, 2008, MRI revealed Mr. Browning also suffered from failed laminectomy syndrome.   <u>Id.</u> at ¶ 19.   Dr. Frost diagnosed and treated Mr. Browning for degenerative disc disease of the lumbar spine, post-laminectomy syndrome, bilateral lower extremity radiculitis and chronic low back pain.   <u>Id.</u> at ¶ 51. Although surgical intervention was no longer recommended, Mr. Browning's

24

diagnosis remained the same—only the type of treatment he received was altered.   The fact that no further surgery was recommended is not inconsistent with Mr. Browning's diagnoses or reported pain.

The ALJ noted Mr. Browning reported his sleep and mood had improved and he was able to bend over easier.   (AR at p. 36).   The ALJ further noted Mr. Browning reported partaking in the significant activities of daily living, including "doing dishes, laundry, vacuuming, cooking, getting groceries, driving a car and a motorcycle," and Mr. Browning enjoyed gardening, reading and caring for his pets.   Id.   However, the ALJ did not note that Mr. Browning also reported to Ms. Boyle that doing the "dishes, laundry, and vacuuming are painful for him and require[] a change in position to reduce pain."   (AR at p. 774).   Similarly, the ALJ did not note Mr. Browning reported his "sleep is interrupted with pain, requiring him to get up and move around every couple of hours."   Id.

Although "acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving and walking are inconsistent with subjective complaints of disabling pain," Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009), Mr. Browning's alleged inability to sleep properly or perform many of the functions without experiencing pain is significant.   The Eighth Circuit instructed that in order to determine "whether a claimant has the residual functional capacity necessary to be able to work we look to whether she has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'"   Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004) (quoting

McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (*en banc*)).   In the
fibromyalgia context, the Eighth Circuit held "the ability to engage in activities
such as cooking, cleaning, and hobbies, does not constitute substantial evidence
of the ability to engage in substantial gainful activity."   Brosnahan v. Barnhardt,
336 F.3d 671, 677 (8th Cir. 2003) (citing Kelley, 133 F.3d at 588-89); see also
Savage v. Colvin, __ F. Supp. 2d __, 2014 WL 4351603, at *9 (S.D. Iowa Sept. 3,
2014) (finding that intermittent activities such as taking care of a pet, performing
light cleaning, using public transportation, preparing light meals and shopping
"show[] nothing of the claimant's ability to work") (citations omitted).

     Mr. Browning's statements must be taken in context.   He reported
experiencing pain when doing dishes, laundry and vacuuming.   (AR at p. 774).
He walks a quarter mile in the morning and a quarter mile in the afternoon for
"some sense of exercise."   (AR at p. 60).   When asked if he could walk three
hours a day, five days a week, he reported that he only could do that if he was
able to lie down for two to three hours per day.   (AR at pp. 58, 62).   Mr.
Browning's assessment of his abilities is consistent with that of Dr. Frost.
Compare AR at pp. 55-68, 782, with AR at pp. 977-84.   Mr. Browning's reports
of improvement in performing life's daily activities are not inconsistent with his
statements that he can perform those activities only occasionally and
intermittently.

     Furthermore, Mr. Browning's reports do not indicate that he is presently
equipped to handle the "sometimes competitive and stressful conditions" that

accompany day-to-day employment.   See Forehand, 364 F.3d at 988 (citations omitted) (internal quotation marks omitted); see also Singh, 222 F.3d at 453 ("[The Eighth Circuit] has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity.") (citing Kelley, 133 F.3d at 588-89).   The court finds a significant difference between continuously working an eight-hour day, five days a week and occasionally playing with one's kittens.   See AR at p. 62.

Finally, Mr. Browning has a strong work history with earnings every year from 1982 through his injury in 2007.   (AR at p. 169).   An ALJ is required to consider a claimant's prior work history when weighing the claimant's credibility. See O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003) (citing Bowman v. Barnhart, 310 F.3d 1080, 1083 (8th Cir. 2002)).   The ALJ provided no indication he considered Mr. Browning's work history in assessing Mr. Browning's credibility.   The ALJ must reconsider Mr. Browning's credibility in light of the above analysis.

### b.   The ALJ's Reliance on Ms. Boyle's Opinions Is Misplaced

The ALJ erred in assessing Mr. Browning's credibility in light of Ms. Boyle's opinion that he could perform sedentary work activities.   Mr. Browning's RFC, as determined by the ALJ, is not indicative of his ability to perform sedentary work as defined by the SSA.   The ALJ found Mr. Browning could "sit for 4 hours a day [and] stand dynamically and statically for a total of 4 hours a day."   (AR at

27

p. 36).   In reaching this conclusion, the ALJ assigned "great weight" to the

findings of Ms. Boyle, who opined:

> [Mr. Browning] tolerates sitting frequently for 60 minute intervals (4 hours per day). Dynamic standing is tolerated frequently for 45 minute intervals (3 hours per day), and static standing is poorly tolerated for 15 minute intervals (1 hour/day). Frequent weight shifting, compensatory posturing to take pressure off of his low back by leaning forward, and alternating between sitting and standing is noted throughout this evaluation.

Id. at p. 782.   Ms. Boyle defines "frequently" as "2.6-5.25 hours per day."   Id. at

776.

Dr. Frost opined Mr. Browning only could sit for 0-1 hour and stand/walk

for 0-1 hour in an eight-hour day.   Id. at p. 979.   Furthermore, Dr. Frost noted

that Mr. Browning must get up and move around every thirty minutes and must

wait thirty minutes after getting up before sitting down again.   Id. at 979-80.

Mr. Browning testified he could sit for approximately forty-five minutes to

one hour before he would have to "get up and move around" for approximately

fifteen to twenty minutes before he could sit again.   Id. at 57-58.   Mr. Browning

further testified if he was performing a five-day-a-week job working eight hours

per day, the most he could sit would be three hours per day, the most he could

stand would be "a couple, three hours" and he could walk two to three hours per

day, but he could not do any of these unless provided the opportunity to lie down

for approximately three hours per day (one hour in the morning and two hours in

the afternoon).   Id. at 58-63.

The SSA characterizes sedentary work as requiring only occasional

walking and standing.   20 CFR § 404.1567(a).   The SSA defines "occasional"

as, "occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday."   Titles II & XVI: Determining Capability to Do Other Work—Implications of a Residual Functional Capacity for Less than a Full Range of Sedentary Work, SSR 96-9p (S.S.A 1996); see also Titles II & XVI: Determining Capability to Do Other Work—The Medical-Vocational Rules of Appendix 2, 1983-1991, SSR 83-10 (S.S.A. 1983). The amount of sitting required in a sedentary job, "would generally total about 6 hours of an 8-hour workday."   SSR 96-9p.

Not even Ms. Boyle, who provided the most aggressive estimate of Mr. Browning's RFC, opined Mr. Browning could sit for six hours per day, five days a week—the requirement for sedentary work under the SSA's policy guidance. The ALJ's own assessment of Mr. Browning's RFC (the ability to sit only for four hours per day) would exclude Mr. Browning from the type of work included in the SSA's "sedentary" classification.   See AR at p. 36.   Nevertheless, the ALJ determined Mr. Browning could perform "sedentary" work.   Id. at 36-37.

The ALJ's aggregate finding that Mr. Browning "can sit for 4 hours a day [and] stand dynamically and statically for a total of 4 hours a day" misses the mark when determining the jobs available to a person with Mr. Browning's specific RFC.   See id. at 36.   Ms. Boyle, Dr. Frost and Mr. Browning all stated Mr. Browning only is able to sit, stand and walk in intervals with a distinct waiting period of approximately fifteen to thirty minutes before he is able to

recommence the activity.[4]   See supra.   The ALJ's general finding that Mr. Browning can sit for four hours a day does not give an accurate portrayal of Mr. Browning's RFC.

The ALJ's decision to find not credible Mr. Browning's statements regarding his disability symptoms beginning July 21, 2011, was due in large part to the conflicting opinions of Ms. Boyle.   (AR at p. 36).   Ms. Boyle did not apply the same characteristics of "sedentary work" the SSA applies.   As a result, she overestimates Mr. Browning's RFC.   Accordingly, the matter is remanded to the ALJ to reevaluate Mr. Browning's credibility in light of the court's analysis.   The ALJ also must reassess Mr. Browning's RFC to conform with the SSA's applicable standards.

### 3.    ALJ Relied on Flawed Vocational Expert Testimony

The ALJ determined Mr. Browning was unable to perform past relevant work.   Id. at 37.   However, the ALJ also found that beginning July 21, 2011, Mr. Browning possessed the RFC to perform sedentary work.   Id.   At Mr. Browning's November 29, 2011 hearing, the ALJ asked the vocational expert, Mr. Tysdal, "whether jobs exist in the national economy for an individual with [Mr. Browning's] age, education, work experience, and residual functional capacity as

---

[4]This analysis does not give effect to Mr. Browning's claim that he is required to lie down for approximately two to three hours per day.   As the court found above, the ALJ should reconsider Mr. Browning's credibility for purposes of determining whether a medical improvement occurred and, if so, the extent by which Mr. Browning's RFC increased.   In light of the court's earlier finding, a more thorough examination of Mr. Browning's claim that he would be required to lie down for two to three hours per day if he worked an eight-hour day, five days a week is necessary.

of July 21, 2011."   Id.   Mr. Tysdal responded that sufficient jobs existed nationally and locally for a person only able to perform unskilled, sedentary work as an order clerk, address clerk or charge account clerk.   Id.; see also AR at pp. 71-73.   However, counsel for Mr. Browning asked Mr. Tysdal:

> Q:  [T]he jobs you identified for the Judge, would those jobs allow the person to, let's say, after four hours of standing, could such a – I'm sorry – four hours of sitting, could such a person perform those jobs standing for the rest of the day?
>
> VE:   Standing for the rest of –
>
> Q:  Yeah
>
> VE:   Are you saying that –
>
> Q:  I'm saying if the person at most could sit for four hours a day, that would mean that the [sic] for the rest of the day, they could only stand, which would just be three hours. So I wanted to know could those jobs be performed standing?
>
> ****
> VE:   I would say no.

(AR at p. 74).

Mr. Browning asserts Mr. Tysdal's response to this question indicates the ALJ improperly relied on Mr. Tysdal's testimony in reaching his determination Mr. Browning possessed the RFC to perform the identified "sedentary" jobs.   The court agrees.

The Eighth Circuit held that where the hypothetical question posed to the vocational expert does not adequately reflect the claimant's impairments, the testimony of the vocational expert cannot constitute substantial evidence on the record as a whole.   See Ross v. Apfel, 218 F.3d 844, 850 (8th Cir. 2000); Singh,

222 F.3d at 451-53 (citing <u>Pratt v. Sullivan</u>, 956 F.2d 830, 836 (8th Cir. 1992)).
"[T]he testimony of a vocational expert who responds to a hypothetical based on
[the opinion of a consulting physician who has examined the plaintiff only once]
is not substantial evidence upon which to base a denial of benefits."   <u>Singh</u>, 222
F.3d 448, 452 (citing <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000)).

As the court already noted, Ms. Boyle did not apply the SSA's definition of
"sedentary" when determining Mr. Browning's RFC.   Even by Ms. Boyle's
standards, Mr. Browning does not possess the functional capacity to perform
sedentary work as defined by the SSA.   The ALJ gave Ms. Boyle's opinions "great
weight" in reaching his conclusion Mr. Browning possessed the RFC to perform
sedentary work.   (AR at p. 36).   The ALJ's assessment of Mr. Browning's RFC is
based on a flawed finding.   The question posed by the ALJ to Mr. Tysdal
presupposed Mr. Browning could perform sedentary work as defined by the SSA.
Ms. Boyle, Dr. Frost and Mr. Browning have not indicated this is true.   Mr.
Tysdal's response was based on a flawed finding and does not constitute
substantial evidence.

Mr. Tysdal's answer to the questions posed by Mr. Browning's counsel
confirms this finding.   The ALJ only asked Mr. Tysdal what "sedentary or light
work" jobs would be available to someone with fourteen years of education.   <u>Id.</u>
at 71-72.   Mr. Browning's counsel inquired into the jobs available to someone
with Mr. Browning's *specific* RFC as identified by Ms. Boyle.   <u>See Pratt</u>, 956 F.2d
at 836 ("[H]ypothetical question[s] posed to [a] vocational expert must precisely

32

set out all claimant's impairments.") (citations and internal quotation marks

omitted).   This more nuanced line of questioning revealed that Mr. Tysdal did

not believe a person with Mr. Browning's specific RFC as defined by Ms. Boyle

could perform the jobs he previously stated were available.[5]

The government's attempt frame counsel's question as asking Mr. Tysdal

"if a person who was limited to only seven hours of work . . . could perform a full

eight hour workday" is disingenuous.   (Docket 19 at p. 9).   As was made

apparent by counsel's prior iteration of the question, the thrust of the inquiry

was whether a person who is able to sit for only four hours could perform the job

of an order clerk, address clerk or charge account clerk while standing up for the

remainder of the day.   See AR at p. 74.   Mr. Tysdal responded in the negative.

The ALJ himself found the question was "clear[ly]" posed.   Id.   The court

agrees.

The ALJ's reliance on Mr. Tysdal's opinion is misplaced because the

opinion is not based on Mr. Browning's specific impairments and RFC.

Therefore, the ALJ's finding that jobs "exist in significant numbers in the

national economy that [Mr. Browning] can perform" was based on flawed

information and is not supported by substantial evidence in the record as a

whole.   Id. at 37.   The ALJ must reevaluate Mr. Browning's RFC and determine

---

[5]Mr. Tysdal's answer is not surprising.   Ms. Boyle determined Mr. Browning could sit only for four hours per day, while a sedentary job as defined by the SSA frequently requires sitting for six hours or more per day.

whether jobs exist in significant numbers in the national economy which Mr. Browning can perform.

### 4.     The ALJ Must Clarify the Date Mr. Browning's Disability Ended

The court requires clarification regarding the discrepancy between the date the ALJ found a medical improvement occurred (July 21, 2010) and the date Mr. Browning's disability ended (July 21, 2011).   The ALJ found a "[m]edical improvement occurred as of July 21, 2011, the date [Mr. Browning's] disability ended."   (AR at p. 36) (citing 20 CFR 404.1594(b)(1)); but see id. at 23 ("All references to medical improvements should read as having occurred as of 'July 21, 2010.' ").   The ALJ also found that "beginning on July 21, 2011, [Mr. Browning] . . . had the residual functional capacity to perform sedentary work. " Id. at 36 (citing 20 CFR 404.1567(a)).   After examining Mr. Browning's RFC beginning July 21, 2011, the ALJ found "[Mr. Browning's] disability ended July 21, 2011" due to the existence of a significant number of sedentary jobs Mr. Browning could perform.   Id. at 37.   Nonetheless, the ALJ ultimately concluded Mr. Browning's period of disability lasted only from September 1, 2007, through July 20, 2010.   (AR at p. 38); see also id. at 773.   Ms. Boyle's report, which was given great weight by the ALJ in reaching his finding that a medical improvement occurred, was drafted on July 20, 2010.

It is unclear how the ALJ concluded Mr. Browning was disabled only through July 20, 2010, when the ALJ found Mr. Browning's disability ended July 21, 2011, based on his assessment of Mr. Browning's RFC beginning on that date.   The ALJ must clarify: the date, if any, Mr. Browning's medical improvement occurred; the date, if any, Mr. Browning's disability ended; and the

rationale in assessing Mr. Browning's RFC one year after having already found a medical improvement.   Because Mr. Browning's medical improvement related to his ability to work, id. at 36, the appropriate time period from which to assess his RFC is the date the medical improvement occurred.   If the date of medical improvement is the end date of Mr. Browning's disability, the ALJ should assess Mr. Browning's RFC as of that date.

### ORDER

Based on the foregoing discussion, the court finds the ALJ's decision is not supported by substantial evidence in the record as a whole.   The ALJ improperly assessed the credibility of Dr. Frost and Mr. Browning, the ALJ improperly relied on the opinions of Ms. Boyle in determining Mr. Browning's residual functional capacity, and the ALJ relied on flawed vocational expert testimony in identifying the jobs available to Mr. Browning.   Accordingly, it is hereby

ORDERED that plaintiff's motion to reverse the decision of the Commissioner (Docket 15) is granted in part and denied in part.

IT IS FURTHER ORDERED that, pursuant to sentence four of 42 U.S.C. § 405(g), the case is remanded to the Commissioner for rehearing consistent with the court's analysis.

IT IS FURTHER ORDERED that defendant's motion to affirm the decision of the Commissioner (Docket 18) is denied.

Dated September 30, 2014.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE

35